**Slip Op. 05-80**

# UNITED STATES COURT OF INTERNATIONAL TRADE
## BEFORE: CARMAN, JUDGE

|  |  |  |
|---|---|---|
| **HANGZHOU SPRING WASHER CO., LTD.,** | : | |
| **Plaintiff,** | : | |
| v. | : | |
| **UNITED STATES,** | : | **Court No. 04-00133** |
| **Defendant,** | : | |
| and | : | |
| **SHAKEPROOF ASSEMBLY COMPONENTS DIVISION OF ILLINOIS TOOL WORKS, INC.,** | : | |
| **Defendant-Intervenor.** | : | |

[Upon consideration of Plaintiff's Rule 56.2 motion for judgment upon the agency record, Defendant and Defendant-Intervenor's responses, and Plaintiff's reply, Plaintiff's motion is granted in part and denied in part. The Department of Commerce's determination in *Certain Helical Spring Lock Washers from the People's Republic of China,* 69 Fed. Reg. 12,119 (Dept's Commerce Mar. 15, 2004) (notice of final results of antidumping duty admin. review) is affirmed in part and remanded in part.]

Dated: July 6, 2005

*White & Case LLP* (*William J. Moran, William J. Clinton, Adams C. Lee*, *Emily Lawson*), Washington, D.C., for Plaintiff.

*Peter D. Keisler*, Assistant Attorney General; *David M. Cohen,* Director, Commercial Litigation Branch, Civil Division, United States Department of Justice; *Jeanne M. Davidson*, Deputy Director, Commercial Litigation Branch, Civil Division, United States Department of Justice; *David S. Silverbrand*, Trial Attorney, Commercial Litigation Branch, Civil Division, United States Department of Justice; *James K. Lockett*, Senior Attorney, Office of Chief Counsel for Import Administration, United States Department of Commerce, Of Counsel, for Defendant.

*Hume & Associates PC* (*Robert T. Hume*), Washington, D.C., for Defendant-Intervenor.

## OPINION

**CARMAN, Judge:** This matter comes before this Court on a motion for judgment on the agency record filed by Plaintiff Hangzhou Spring Washer Company ("Plaintiff" or "Hangzhou"). Plaintiff challenges the final results by the United States Department of Commerce ("Defendant" or "Commerce") in *Certain Helical Spring Lock Washers from the People's Republic of China*, 69 Fed. Reg. 12,119 (Dep't Commerce Mar. 15, 2004) (notice of final results of antidumping duty admin. review) [hereinafter *Final Results*]. Plaintiff seeks remand on the following four issues: (1) valuation of steel wire rod; (2) valuation of plating; (3) valuation of overhead, selling, general and administrative expenses ("SG&A"), and profit; and (4) request for revocation. The parties concur regarding the remand request on the issue of the subsidy suspicion determination. This Court affirms in part and remands in part the *Final Results* as set forth below. This Court has jurisdiction over this case pursuant to 28 U.S.C. § 1581(c) (2000) and 19 U.S.C. § 1516a(a)(2)(A)(i) (2000).

## BACKGROUND

This is the ninth administrative review of the antidumping duty order pertaining to helical spring lock washers ("HSLW") from the People's Republic of China ("China"), and the period of review ("POR") is from October 1, 2001, through September 30, 2002. Pursuant to 19 C.F.R. § 351.222(e)(1) (2004),[1] Hangzhou requested revocation of the antidumping duty in this

___

[1] 19 C.F.R. § 351.222(e)(1) states:

> Antidumping proceeding. During the third and subsequent annual anniversary months of the publication of an antidumping order or suspension of an antidumping investigation, an exporter or producer may request in writing that the Secretary revoke an order or terminate a

administrative review, claiming this is the third consecutive year it sold the subject merchandise not below normal value. (*Pl.'s Mem. of P. & A. in Supp. of Hangzhou's Mot. for J. on the Agency R.* at 38 ("*Pl.'s Mem.*").) However, Commerce found that HSLW were being sold in the United States at below normal value by Hangzhou during this POR. *Final Results*, at 12,120. Accordingly, Commerce determined not to revoke the antidumping duty order with respect to Hangzhou pursuant to 19 C.F.R. § 351.222(b)(1) (2004).[2] *Id.*

On October 2, 2002, Commerce published *Antidumping or Countervailing Duty Order, Finding, or Suspended Investigation*, 67 Fed. Reg. 61,849 (Dep't Commerce Oct. 2, 2002) (opportunity to request administrative review). In response to Hangzhou and Defendant-Intervenor Shakeproof Assembly Components Division of Illinois Tool Works, Inc.'s ("Defendant-Intervenor" or "Shakeproof") timely request, Commerce initiated a review. *Initiation of Antidumping and Countervailing Duty Administrative Reviews and Requests for Revocation in Part*, 67 Fed. Reg. 70,402 (Dep't Commerce Nov. 22, 2002).

Because it is undisputed that the China qualifies as a non-market economy ("NME"), Commerce constructed a normal value for the various factors of production by gathering surrogate normal value data from market economy sources using a factors of production

suspended investigation . . . .

[2] 19 C.F.R. § 351.222(b)(1)(i), in relevant part, reads:

> In determining whether to revoke an antidumping duty order or terminate a suspended antidumping investigation, the Secretary will consider:
>
> (A) whether all exporters and producers covered at the time of revocation by the order or the suspension agreement have sold the subject merchandise at not less than normal value for a period of at least three consecutive years . . .

methodology. Commerce invited interested parties to submit information regarding surrogate values. (Public Record ("P.R.") 13-14.) After Commerce issued the initial and first supplemental questionnaires and received responses from Hangzhou and deficiency comments from Shakeproof, the concept of subsidy suspicion against this subject merchandise appeared on the record. (P.R. 19, 23, 24, 28, 30, 39, 49.)

On June 20, 2003, Shakeproof requested that Commerce apply its subsidy suspicion policy in its pre-preliminary determination comments. Shakeproof cited subsides found in earlier Commerce countervailing duty investigations involving cut-to-length steel from the United Kingdom ("UK") and contended that Hangzhou's wire rod supplier may have benefitted. Commerce then issued a second supplemental questionnaire to Hangzhou and subsequently conducted a verification of Hangzhou's second supplemental questionnaire responses. (P.R. 45.) On October 31, 2003, Commerce issued a memorandum on the valuation of the factors of production, which determined that India would be the surrogate country and detailed the valuation of the factors of production. (P.R. 49.)

On November 7, 2003, Commerce published *Certain Helical Spring Lock Washers from the People's Republic of China,* 68 Fed. Reg. 63,060 (Dep't Commerce Nov. 7, 2003) (preliminary results of antidumping duty admin. review) [hereinafter *Preliminary Results*]. In the *Preliminary Results*, Commerce declined to value wire rod at the price Hangzhou paid its market economy supplier because Hangzhou's supplier may have benefitted from subsidies. *Preliminary Results* at 63,063. Commerce instead used surrogate country data to determine the value of the steel wire rod and the value of the plating factors of production. Commerce also opted to use more contemporaneous surrogate data than formerly used in prior reviews.

In December 2003, Hangzhou submitted additional information on surrogate value.  In January 2004, Hangzhou and Shakeproof submitted case and rebuttal briefs.  (P.R. 58-61.)  On March 15, 2004, Commerce issued the *Final Results*.  Commerce found that Hangzhou sold HSLW at below normal value during the POR, calculated Hangzhou's dumping margin to be 28.59 percent *ad valorem*, and rejected Hangzhou's request for revocation.  *Final Results*, 69 Fed. Reg. at 12,119-20.  Hangzhou timely appealed.

## STANDARD OF REVIEW

In reviewing a challenge to Commerce's final determination in an antidumping administrative review, the Court will uphold Commerce's decision unless it is "unsupported by substantial evidence on the record, or otherwise not in accordance with law . . . ."  Tariff Act of 1930, § 516A(b)(1)(B) (codified as amended at 19 U.S.C. § 1516a(b)(1)(B)(i) (2000)).  "Substantial evidence is more than a mere scintilla.  It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."  *Consol. Edison Co. v. NLRB*, 305 U.S. 197, 229 (1938) (citations omitted); *see also Micron Tech., Inc. v. United States*, 117 F.3d 1386, 1393 (Fed. Cir. 1997).  "As long as the agency's methodology and procedures are reasonable means of effectuating the statutory purpose, and there is substantial evidence in the record supporting the agency's conclusions, the court will not impose its own views as to the sufficiency of the agency's investigation or question the agency's methodology."  *Ceramica Regiomontana, S.A. v. United States*, 10 CIT 399, 404-05, 636 F. Supp. 961 (1986) (citations omitted), *aff'd*, 810 F.2d 1137 (Fed. Cir. 1987).

In determining whether Commerce's interpretation and application of the antidumping statute is in accordance with law, this Court must consider "whether Congress has directly spoken to the precise question at issue," and if not, whether the agency's interpretation of the statute is reasonable. *Chevron U.S.A., Inc. v. Natural Res. Def. Council, Inc.*, 467 U.S. 837, 842-43 (1984). "[A] court must defer to an agency's reasonable interpretation of a statute even if the court might have preferred another." *Koyo Seiko Co. v. United States*, 36 F.3d 1565, 1570 (Fed. Cir. 1994) (citation omitted). Deference is based upon a recognition that Commerce has special expertise in administering the anti-dumping law. *Ta Chen Stainless Steel Pipe, Inc. v. United States,* 298 F.3d 1330, 1335 (Fed. Cir. 2002).

### PARTIES' CONTENTIONS

Plaintiff appeals four main issues: (1) valuation of steel wire rod; (2) valuation of plating; (3) valuation of overhead, SG&A, and profit; and (4) request for revocation. The contentions of the parties are set forth below.

### A.      Plaintiff's Contentions

### (1)      Valuation of steel wire rod

Hangzhou argues that Commerce's rejection of its market economy prices for steel wire rod is an arbitrary and unreasonable departure from its past practice. Hangzhou points to Commerce's longstanding preference for using market economy prices. (Pl.'s Mem. at 8.) Hangzhou cites to case law requiring that Commerce rely upon "particular, specific and objective evidence" to reject market prices under the subsidy suspicion policy. (*Id.* at 9.) Hangzhou contends that Shakeproof's speculation that Hangzhou's supplier benefitted from additional

subsidies does not meet the evidentiary requirements to invoke the subsidy suspicion policy.  (*Id.* at 14.)

Hangzhou also argues that there is no evidence that any possible subsidy from its UK supplier benefitted Hangzhou since it purchased steel wire rod imports through a third country trading company in Hong Kong.  (Pl.'s Mem. at 24.)  Hangzhou cites to *Certain Color Television Receivers from the People's Republic of China*, 69 Fed. Reg. 20,594, 20,597 (Apr. 16, 2004) (notice of final determination) [hereinafter *Color TVs*[3]], in support of its assertion that the presumption of a subsidy does not automatically pass through to an intermediate trading company.  (Pl.'s Mem. at 24.)

### (2)    Valuation of plating

Hangzhou contends Commerce's decision to use a single surrogate price quote for plating services is contrary to established practice and not in accordance with law.  Hangzhou argues that Commerce improperly used a single surrogate price rather than following its past practice to value the factors of production used by Hangzhou's plating subcontractors.  (*Id.* at 25.) Hangzhou argues that Commerce deviated from its practice followed in the eight previous

---

[3] In *Color TVs*, Commerce reasoned:

> The regulation does not address those instances where subsidized exports are shipped through a third-country trading company to its final destination.  The trading company in the third country is not subject to the investigation, and cannot therefore be presumed to have benefitted from any subsidies received by the producer or exporter of the merchandise.

*Issues and Decision Memorandum for the Antidumping Duty Investigation of Certain Color Television Receivers from the People's Republic of China*, A-570-884, cmt. 8 (Apr. 16. 2004).

reviews by disregarding Hangzhou's subcontractor's factors of production for plating.  Hangzhou

asserts that in the prior reviews Commerce rejected the very method applied in this review

because the use of a single surrogate price impermissibly double-counts the amounts for

overhead, SG&A and profit.  (*Id.* at 26 (*citing Certain Helical Spring Lock Washers from the*

*People's Republic of China*, 67 Fed. Reg. 8,520, 8,522, cmt. 2 (Dep't Commerce Feb. 25, 2002)

(final results of antidumping duty admin. review) [hereinafter *Seventh Review*].)

Hangzhou also asserts that using a surrogate value for plating will effectively treat

Hangzhou's plating subcontractor as an independent producer by calculating separate overhead,

SG&A, and profit values, in violation of 19 C.F.R. § 351.401(h) (2004).[4]  According to

Hangzhou, this methodology is inexplicably inconsistent with past reviews, in which Commerce

found that Hangzhou controlled its subcontractors.  (Pl.'s Mem. at 27.)  Because Hangzhou

controlled its subcontractors, Commerce did not consider the subcontractors to be producers for

purposes of calculating plating expenses.

> In past administrative reviews of HSLWs, [Commerce]
> acknowledged that applying the surrogate overhead, SG&A, and
> profit to the subcontracted plating operations before being
> incorporated as a material input in the respondent's normal value
> calculation would result in double-counting because all overhead,
> SG&A, and profit expenses were already captured by the
> application of the surrogate overhead, SG&A[,] and profit ratios at
> the final production stage.

---

[4] 19 C.F.R. § 351.401(h) states:

> Treatment of subcontractors ("tolling" operations).  The Secretary will not
> consider a toller or subcontractor to be a manufacturer or producer where
> the toller or subcontractor does not acquire ownership, and does not
> control the relevant sale, of the subject merchandise or foreign like
> product.

(Pl.'s Mem. at 28 (*citing Certain Helical Spring Lock Washers from the People's Republic of China*, 65 Fed. Reg. 31,143, 31,144, cmt. 3 (Dep't Commerce May 16, 2000) (final results of antidumping duty admin. review); *Certain Helical Spring Lock Washers from the People's Republic of China*, 64 Fed. Reg. 13,401, 13,404, cmt. 2 (Mar. 18, 1999) (final results of antidumping duty admin. review)).)

 **(3)  Valuation of overhead, SG&A, and profit**

  Hangzhou contends that Commerce's decision to use general, contemporaneous data rather than industry specific, less recent data to calculate surrogate financial ratios is unsupported by regulations, evidence and facts on the record. (Pl.'s Mem. at 32.) Hangzhou asserts that Commerce's use of 1,927 public companies' ratios from the Reserve Bank of India Bulletin ("RBI Bulletin data") is not industry-specific and therefore not representative of Hangzhou's operations. (*Id.*) Hangzhou argues that Commerce should have continued to use the RBI data set "Processing and Manufacturing: Metals, Chemicals, and Products Thereof" ("metals data") that it used in all the prior administrative reviews. (*Id.* at 33.) Hangzhou claims that availability of more recent but generic data is insufficient justification to depart from Commerce's practice in the previous reviews, in which the agency used the older but more industry specific data.[5] (*Id.* at 35.) Hangzhou asserts that Commerce failed to explain its rationale for imposing time parameters on the available data and why these chosen parameters have an impact on the reliability of the financial data. (*Id.* at 37.)

---

[5] The general RBI Bulletin data is from 2000 to 2001, and the industry specific metals data is from 1992. (Def.'s Resp. at 30.)

### (4)      Request for revocation

Hangzhou contends that Commerce's change in factors of production methodology is of particular concern because the antidumping duty order against its HSLW was eligible for revocation in this review.  (Pl.'s Mem. at 38.)  Hangzhou pointed out that in the two previous reviews Commerce found that Hangzhou had not sold subject merchandise at less than fair value.  (Pl.'s Mem. at 38 (*citing Seventh Review*; *Certain Helical Spring Lock Washers from the People's Republic of China*, 67 Fed. Reg. 69,717 (Dep't Commerce Nov. 19, 2002) (final results of antidumping duty admin. review) [hereinafter *Eighth Review*]).)  Hangzhou argues that Commerce's unwarranted change in established practice resulted in "substantially increasing Hangzhou's margin in this review and disqualifying Hangzhou for revocation."  (Pl.'s Mem. at 38.)  Hangzhou claims that Commerce "must be bound by its prior actions so that parties have a chance to 'purge themselves' of antidumping liabilities."  (*Id.* (*citing Shikoku Chem. Corp. v. United States,* 16 CIT 382, 387, 795 F. Supp. 417 (1992))*.*)  Hangzhou requests that any remand decision include a direction to Commerce to reconsider Hangzhou's request for revocation of the antidumping duty order.  (*Id.* at 39.)

## B.      Defendant's Contentions

### (1)      Valuation of steel wire rod

Although Commerce admits to using market prices in the past reviews, Commerce explains that the record in this review is different.  *Issues and Decision Memorandum for the Final Results of Antidumping Duty Administrative Review of Certain Helical Spring Lock Washers from the People's Republic of China*, A-570-822, cmt. 1 (Mar. 8, 2004) [hereinafter *Decision Memo*].  In this review, Commerce received evidence that suggested for the first time

that Hangzhou's steel wire rod prices may have been distorted by subsidies.  Commerce claims

that its "past findings in this proceeding do not preclude [it] from considering [new] information

and changing its treatment of Hangzhou's [steel wire rod] prices based on that information."  *Id.*

Although Commerce acknowledges its preference for using actual market prices to value factors

of production, Commerce explains that legislative history limits the use of market economy

prices to "only untainted market economy prices," and in this review, the market prices may have

been tainted by subsidy.  (Def.'s Resp. at 14.)

Although Commerce contends that its decision to invoke the subsidy suspicion policy

was reasonable based upon Shakeproof's submissions, Commerce admits that the subsidies were

generally used by the UK steel industry and admittedly were not tied to a particular steel product.

Commerce points out that this Court has recognized that even a general subsidy may provide a

reasonable basis to conclude that Hangzhou's supplier may have benefitted from the alleged

subsidy.  (Def.'s Resp. at 18-19 (*citing China Nat'l Mach. Imp. & Exp. Corp. v. United States*,

264 F. Supp. 1229, 1238 (CIT 2003)).)

While Commerce concedes that *Color TVs*, 69 Fed. Reg. at 20,594, represents a change

of policy, Commerce points out that this change occurred after this matter's *Final Results* were

issued.  Notwithstanding the subsequent timing, Commerce requests a voluntary remand on the

issue of the subsidy suspicion policy.  (Def.'s Resp. at 19.)  "Specifically, upon remand,

Commerce would consider the issue of whether the trading company included any benefit from

the subsidy when it sold to Hangzhou."  (*Id.*)  Hangzhou consents to this remand request.  (Reply

Br. in Supp. of Pl.'s Rule 56.2 Mot. for J. upon the Agency R. at 1.)

## (2) Valuation of plating

Commerce admits that it veered from its past practice in this review by using a single surrogate plating price instead of a plating build-up price. *Decision Memo* at 16. Nevertheless, Commerce notes that it prefers surrogate prices over build-up prices when the respondent is not a fully integrated producer.[6] *Id.* at 17. Hangzhou is not a fully integrated producer because it is unable to plate its own HSLW. However, in prior reviews, the only available plating data was Hangzhou's platers' factors of production. *Id.* In contrast, in this review, Shakeproof introduced another option – a single plating price quote. Therefore, Commerce could employ its preference for surrogate prices. *Id.* Commerce asserts its change in this review actually reflects its "normal practice." *Id.* Moreover, Commerce found that the single surrogate plating price was the best available information because "it accurately reflects Hangzhou's business operations and the costs it incurs to produce plated HSLWs." *Id.* Finally, Commerce asserts that it has "broad discretion in selecting surrogate values," and it has exercised this discretion. *Id.* at 19.

## (3)     Valuation of overhead, SG&A, and profit

Commerce contends that its decision to use more contemporaneous and nonspecific data rather than specific and less contemporaneous data is statutorily permissible pursuant to its discretionary power authorized in 19 U.S.C. § 1677b(c) (2000). (Def.'s Resp. at 27.) Although conceding that the metals data is more specific than RBI Bulletin data, Commerce responds it exercised its discretion in valuing contemporaneity over specificity. (*See id.*; *see also Decision Memo* at 21.) Commerce argues that contemporaneous data is the best available information "because the Indian economy has been quickly transforming in the past few years, negating the

---

[6] Plating build-up is when the factors of production are consumed by unaffiliated plating subcontractors. *See Decision Memo* at 16.

relevancy of the nine year old data." (Def.'s Resp. at 27.) Commerce further asserts that using more contemporaneous data was consistent with its duty to calculate antidumping rates with maximum accuracy. (*Id.* at 29.)

**(4)     Request for revocation**

Commerce contends it properly determined that Hangzhou did not qualify for revocation of the antidumping order because Hangzhou did not meet the regulatory requirement of three consecutive zero or *de minimis* margins pursuant to 19 C.F.R. § 351.222(b)(1). (Def.'s Resp. at 36.) Although Commerce found Hangzhou to have *de minimis* margins in the two previous reviews, Commerce determined that Hangzhou sold subject merchandise at less than normal value during this review. (*Id.*) Commerce contends that it must consider new evidence presented during each review without consideration that the review might be determinative of a revocation. (*Id.*)

**C.     Defendant-Intervenor's Contentions**

**(1)     Valuation of steel wire rod**

Shakeproof contends that Commerce properly rejected Hangzhou's submission of market economy prices for the valuation of steel wire rod. Although noting that Commerce typically prefers market economy import prices, Shakeproof emphasizes that such preference is discretionary and "does not override Commerce's established practice to disregard a market price if Commerce has a 'reason to believe or suspect' the market economy input benefitted from subsidies." (Def.-Intervenor's Resp. in Opp'n to Pl.'s Mot. for J. upon the Agency R. at 3-4. ("Def.-Int.'s Resp.").) Citing legislative history, Shakeproof argues that Commerce should disregard market economy prices where there is a reason to believe or suspect the prices may be

dumped or subsidized. (Def.-Int.'s Resp. at 9.) Shakeproof purports that it is sufficient that Commerce suspected subsidization for it to apply the subsidy suspicion policy to the valuation of steel wire rods.

### (2)       Valuation of plating

Shakeproof contends that Commerce's decision to use a single surrogate price for the valuation of plating services was supported by substantial evidence and otherwise in accordance with law. (Def.-Int.'s Resp. at 17.) Shakeproof supplied a single surrogate price quote that involved an arm's length transaction in quantities similar to Hangzhou's and was comparable to the plating value calculated from separate inputs. (*Id.*) Commerce used Shakeproof's single price quote to value plating. (*Id.*) Shakeproof's contentions are essentially the same as Commerce's (*id.* at 16-17), have been duly considered, and need not be reiterated in their entirety.

### (3)       Valuation of overhead, SG&A, and profit

Shakeproof contends Commerce correctly chose the more contemporaneous RBI Bulletin data to value overhead, SG&A, and profit. (*Id.* at 18.) As with the previous subsection, Shakeproof's contentions are virtually similar to Commerce's (*id.* at 17-18), have been duly considered, and will not be repeated.

ANALYSIS

Congress provided Commerce with a statutory scheme for calculating dumping margins. When the antidumping investigation involves a non-market economy, as is China, 19 U.S.C. § 1677b(c) governs. This section provides that Commerce construct a normal value of the

subject merchandise from the best available information on the valuation of the factors of

production.  19 U.S.C. § 1677b(c).[7]  Courts have noted that "the process of constructing foreign

market value for a producer in a nonmarket economy country is difficult and necessarily

---

[7] 19 U.S.C. § 1677b(c), in pertinent part, states:

**(1) In general**

If--
      (A) the subject merchandise is exported from a nonmarket country, and
      (B) the administering authority finds that available information does not
permit the normal value of the subject merchandise to be determined under
subsection (a) of this section,

the administering authority shall determine the normal value of the subject
merchandise on the basis of the value of the factors of production utilized in
producing the merchandise and to which shall be added an amount for general
expenses and profit plus the cost of containers, coverings, and other expenses.
Except as provided in paragraph (2), the valuation of the factors of production
shall be based on the best available information regarding the values of such
factors in a market country or countries considered to be appropriate by the
administering authority.

. . .

**(3) Factors of production**
For purposes of paragraph (1), the factors of production utilized in producing
merchandise include, but are not limited to--
      (A) hours of labor required,
      (B) quantities of raw materials employed,
      (C) amounts of energy and other utilities consumed,
      (D) representative capital cost, including depreciation.

**(4) Valuation of factors of production**
The administering authority, in valuing factors of production under paragraph (1),
shall utilize, to the extent possible, the prices or costs of factors of production in
one or more market economy countries that are--
      (A) at a level of economic development comparable to that of the
nonmarket economy country, and
      (B) significant producers of comparable merchandise.

imprecise.*" Nation Ford Chem. Co. v. United States*, 166 F.3d 1373, 1377 (Fed. Cir. 1999)

(citation omitted). The critical question when valuing the factors of production is "whether the

methodology used by Commerce is based on the best available information and establishes

antidumping margins as accurately as possible." *Shakeproof Assembly Components, Div. of Ill.*

*Tool Works, Inc. v. United States*, 268 F.3d 1376, 1382 (Fed. Cir. 2001) ("Shakeproof III").

Because there is no statutory definition, courts have read this provision to give broad discretion

to Commerce on what constitutes the best available information. *See, e.g.*, *Luoyang Bearing*

*Corp. v. United States,* 347 F. Supp. 2d 1326, 1333 (CIT 2004) ("The statute, however, does not

define the phrase 'best available information' . . . . Commerce is given broad discretion 'to

determine margins as accurately as possible . . . . '") (internal citation omitted); *Shakeproof*

*Assembly Components Div. of Ill. Tool Works, Inc. v. United States*, 23 CIT 479, 481, 59 F.

Supp. 2d 1354 (1999) ("Shakeproof I") ("The statute requires Commerce to use the best available

information, but does not define that term . . . . If Congress had desired to restrict the material on

which Commerce could rely, it would have defined best available information.") (citations

omitted). Therefore, a reviewing court's role is "not to evaluate whether the information

Commerce used was the best available, but rather whether Commerce's choice of information is

reasonable." *Peer Bearing Co.-Changshan v. United States*, 298 F. Supp. 2d 1328, 1336 (CIT

2003). Accordingly, the hallmark of a reviewing court's standard of best available information is

reasonableness.

        Furthermore, there is no statutory requirement for Commerce to use a particular

methodology to calculate valuation for factors of production. *See, e.g., Shakeproof III*, 268 F.3d

at 1382 ("the statute does not require the factors of production to be ascertained in a single

fashion") (*citing Lasko Metal Prod., Inc. v. United States*, 43 F.3d 1442, 1446 (Fed. Cir. 1994));

*Peer Bearing*, 298 F. Supp. 2d at 1336 n.3 ("the statute does not require Commerce to follow any

single approach"). Not only can it chose which methodology to employ, Commerce can also

change it. Although courts have found that Commerce should not change its methodology in the

final hour,[8] more recent case law upholds a new methodology if found reasonable. *See, e.g.*,

*Luoyang*, 347 F. Supp. 2d at 1339 ("an agency decision to change its methodology should be

examined under the *Chevron* test and sustained if the new methodology is reasonable"); *Koyo*

*Seiko*, 36 F.3d at 1575 (holding that Commerce's stated rationale for changing its methodology

was reasonable). Nevertheless, when an agency departs from its practice, it must "clearly set

forth" the ground "so that the reviewing court may understand the basis of the agency's action

and so may judge the consistency of that action with the agency's mandate." *Atchison, Topeka &*

*Santa Fe Ry. Co. v. Wichita Bd. of Trade*, 412 U.S. 800, 808 (1973); *see also Shanghai Foreign*

*Trade Enter. Co., Ltd. v. United States*, 318 F. Supp. 2d 1339, 1346 (CIT 2004) ("Commerce . . .

has an additional 'duty to explain its departure from prior norms.'") (citations omitted).

Although courts have viewed the statute as a guideline to assist Commerce in the process

of constructing foreign market value for a producer in a non-market economy, they have

recognized "this section also accords Commerce wide discretion in the valuation of factors of

production in the application of those guidelines." *Nation Ford,* 166 F.3d at 1377; *see also*

---

[8] In *Shikoku*, the plaintiff relied on Commerce's permission to adjust home market prices to reflect repackaging costs paid to its subcontractor. However, in the final determination, Commerce retroactively applied a new methodology excluding those repackaging costs. On these facts, this Court held that Commerce's change in methodology at this late stage went against principles of fairness. 16 CIT at 388. The facts of the instant case are distinguishable. There is no argument about retroactive changes of methodology on the record. Thus, any reliance on *Shikoku* is misplaced.

*Fuyao Glass Indus. Group Co., Ltd. v. United States*, Slip Op. 03-169, 2003 Ct. Int'l Trade

LEXIS 171, at *22 (CIT Dec. 18, 2003) ("this Court and the Court of Appeals for the Federal

Circuit have repeatedly upheld Commerce's broad discretion in valuing factors of production").

Commerce's discretion is not without limitation, however, as the statute's directive is "to

construct the subject merchandise's normal value as it would have been if the [non-market

economy] country were a market economy country." *Peer Bearing*, 298 F. Supp. 2d at 1336

(citation omitted); *see also CITIC Trading Co., Ltd. v. United States*, Slip Op. 03-23, 2003 WL

1587093, at *6 n.12 (CIT Mar. 4, 2003) ("This discretion . . . is constrained by the underlying

objective of the statute; to obtain the most accurate dumping margins possible.").

**(1)     Valuation of steel wire rod**

In this review, valuation of steel wire rod embodies the issue of the subsidy suspicion

policy.  In light of its recent *Color TVs* determination, 69 Fed. Reg. at 20,597, Commerce

requests voluntary remand on this issue, and Hangzhou consents.  This Court grants Commerce's

request for voluntary remand.  However, Commerce requests a limit on its review on remand to

whether any benefit was transferred to Hangzhou from its third country trading company.

Because this request is for a limited review, this Court believes the issue of subsidy suspicion

policy merits a short discussion.

Contrary to prior reviews where Hangzhou's market economy prices were used,

Commerce invoked a subsidy suspicion policy in this review.  For the first time in HSLW review

history, Shakeproof placed on the record a subsidization issue.  Commerce reasonably notes that

its "past findings in this proceeding do not preclude [it] from considering [new] information and

changing its treatment of Hangzhou's [steel wire rod] prices based on [new] information in this

administrative review." *Decision Memo* at 7. By invoking the subsidy suspicion policy, Commerce went against its own regulatory norm of using market economy prices pursuant to 19 C.F.R. § 351.408(c)(1) (2004).[9] Commerce defends its position by pointing to legislative history which states, "In valuing such factors [of production], Commerce shall avoid using any prices which it has reason to believe or suspect may be dumped or subsidized prices." H.R. Conf. Rep. No. 100-576, at 590 (1988) [hereinafter *OTCA Legis. Hist.*]. This Court finds Commerce and Shakeproof's arguments persuasive that the Congressional directive for subsidy suspicion and regulatory preference for market prices are not mutually exclusive. Rather, Commerce's rationale that market prices will be used, as in past reviews, when the subsidy suspicion policy is not invoked is reasonable. As aptly stated in *China National*, "given that the overarching purpose of the antidumping and countervailing duty law is to counteract dumping and subsidies, the court cannot conclude that Congress would condone the use of any value where there is a 'reason to believe or suspect' that it reflects dumping or subsidies." 264 F. Supp. 2d at 1238; *see also Luoyang*, 347 F. Supp. 2d at 1340.

Because the subsidy suspicion policy has no statutory definition, this Court has provided instruction regarding the interpretation of the subsidy suspicion standard:

---

[9] 19 C.F.R. § 351.408(c)(1) states:

  Information used to value factors. The Secretary will normally use publicly available information to value factors. However, where a factor is purchased from a market economy supplier and paid for in a market economy currency, the Secretary normally will use the price paid to the market economy supplier. In those instances where a portion of the factor is purchased from a market economy supplier and the remainder from a nonmarket economy supplier, the Secretary normally will value the factor using the price paid to the market economy supplier.

> In attempting to define a similar phrase, "reasonable grounds to
> believe or suspect," which appears in 19 U.S.C. § 1677b(b)(1)
> (1999), this Court observed that "in order for reasonable suspicion
> to exist there must be 'a particularized and objective basis for
> suspecting' the existence of certain proscribed behavior, taking
> into account the totality of the circumstances, the whole picture."
> . . . This insistence on "a particularized and objective basis" has
> been interpreted to mean a "'demand for specificity.'" . . .
> Therefore, the "reason to believe or suspect" standard at issue here
> must be predicated on particular, specific, and objective evidence.

*China Nat'l*, 264 F. Supp. 2d at 1239 (internal citations omitted); *see also Peer Bearing*, 298 F.

Supp. 2d at 1336.  Although invocation of the suspect standard requires specificity, this does not

mean that subsidies must be company specific.  This Court has found subsidies "generally

available in the exporting market-economy country," but not company specific, as sufficient

evidence on the record to affirm application of the suspect suspicion policy.  *See Peer Bearing*,

298 F. Supp. 2d at 1337 ("The Court finds that Commerce made a logical inference that [the

respondent's] supplier *may have* benefitted from the generally available subsidies.") (emphasis

added).  This Court notes that Congress did "not intend for Commerce to conduct a formal

investigation to ensure that such prices are not dumped or subsidized, but rather intend[ed] that

Commerce base its decision on information generally available to it at that time."  OTCA Legis.

Hist., at 590-91; *see also Luoyang*, 347 F. Supp. 2d at 1341; *Peer Bearing*, 298 F. Supp. 2d at

1336; *Fuyao*, 2003 Ct. Intl. Trade LEXIS 717, at *36-37.  In *Peer Bearing*, the subsidies were

generally available, but this Court held that "[a]ny level of subsidization found in the exporting

country is enough evidence to support a determination that Commerce had 'reason to believe or

suspect' that prices are distorted."  298 F. Supp. 2d at 1337.  Once Commerce presents adequate

evidence to support a subsidy suspicion, a rebuttable presumption is established that prices are

distorted. *Luoyang*, 347 F. Supp. 2d at 1342. "The presumption shifts the burden to the party challenging Commerce's determination to present evidence demonstrating that its supplier did not benefit from such subsidies." *Id.* In *Luoyang*, this Court suggested that the challenger's burden would be met by sufficient evidence that the prices paid were market-determined or credible evidence that the supplier did not participate in any subsidies programs. *Id.* at 1342 n.10.

This Court does not decide whether the challenging party has met its burden in this case, but rather, this Court grants voluntary remand for Commerce to conduct its review consistent with the discussion herein.

### (2) Valuation of plating

Commerce valued plating using a single surrogate price submitted by Shakeproof rather than build-up prices from subcontractors of Hangzhou. Although Hangzhou claims this is a departure from past practice in prior reviews and Commerce concedes this point, Commerce explains that this change is consistent with its established preferences. Commerce has articulated its preference for surrogate prices over build-up prices in its determinations when a producer is not fully integrated. *See Issues and Decision Memorandum for the Antidumping Duty Investigation of Polvinyl Alcohol from the People's Republic of China*, A-570-879, cmt. 1 (Dep't Commerce Aug. 4, 2003) ("If the NME [] self-produces an input, we take into account the factors utilized in each stage of the production process. . . . If, on the other hand, the firm was not integrated, . . . [Commerce] valued the purchased [product] and not the factors [of production].)" Commerce stated that because Hangzhou does not have the capacity to plate HSLW but rather must subcontract out this task, it is not a fully integrated producer. *Decision Memo* at 17.

Commerce explained that in past reviews, the build-up price was the only option, but in this review, another option was introduced so Commerce could exercise its discretionary authority and utilize its preferred policy. Commerce reasoned that a single surrogate price was the best available information in this review "because it accurately reflects Hangzhou's business operations and the costs it incurs to produce plated HSLWs." *Id.* This Court does not find that Commerce changed its methodology in this situation, as Hangzhou suggests. Because Commerce had two choices in this review, where in prior reviews it had only one, this Court finds that Commerce considered the available new information and acted within the bounds of reason when making its decision based on the best available information.

Moreover, the record reflects Commerce's assertion of its preferred policy for valuing factors for integrated versus non-integrated producers, and the record does not reflect any dispute that Hangzhou is a non-integrated producer. Although Commerce may have previously found that Hangzhou controlled its subcontractors, this does not negate Commerce's current finding that Hangzhou remains a non-integrated producer. This Court cannot make a judgment on Commerce's preferred policy of using a surrogate price over a build-up approach for non-integrated producers but instead finds that Commerce did not act arbitrarily in reaching its decision to use a single surrogate price. *See Peer Bearing*, 298 F. Supp. 2d at 1336 ("Commerce may not act arbitrarily in reaching its decision.").

Regarding the issue of the single surrogate price as double-counting of overhead, SG&A, and profit, Hangzhou argues that this Court should treat its subcontractors as "affiliated" despite the fact that "Hangzhou explained that it is not affiliated with [its] platers." *Decision Memo* at 18; *see also* P.R. 45. This Court declines to create facts on the record. Explaining that the record

contained surrogate value information for two groups of companies that both lacked specific information on integration, Commerce analyzed the record and selected the best available information without regard to the surrogate overhead, SG&A, and profit. *Decision Memo* at 18. This Court defers to Commerce as to what constitutes the best available information and finds that Commerce's decision regarding the issue of double-counting for overhead, SG&A, and profit has a "rational connection between the facts found and the choice made." *Shanghai Foreign Trade*, 318 F. Supp. 2d at 1346 (quotation and citations omitted); *see also Timken Co. v. United States,* 25 CIT 939, 944, 166 F. Supp. 2d 608 (2001) ("[T]he statute grants to Commerce broad discretion to determine the 'best available information' in a reasonable manner on a case-by-case basis.").

Accordingly, this Court holds that Commerce's change in methodology to use a single surrogate price in this review is supported by substantial evidence on the record or otherwise in accordance with law.

### (3)     Valuation of overhead, SG&A, and profit

Regulation 19 C.F.R. § 351.408(c)(4) (2004) states that Commerce "normally will use non-proprietary information gathered from producers of identical or comparable merchandise in the surrogate country" to value overhead, SG&A, and profit. In this review, however, Commerce decided to use the general but more contemporaneous data submitted by Shakeproof. This was a departure from the previous reviews, where Commerce used the specific but less contemporaneous industry specific data provided by Hangzhou. As stated above, a change in methodology is permissible, but it must be supported by substantial evidence on the record. *See Atchison*, 412 U.S. at 808.

Commerce, therefore, has two tasks to explain: (1) why it chose to ignore the regulatory norm and (2) why it departed from past practice. This Court finds that Commerce provided sufficient reasons for both. This Court recognizes that the regulations, like the statute, establish a structure that is not mandatory but rather provides guidance. *See Shakeproof III*, 268 F.3d at 1381. Since neither the statute nor the regulations speak to the issue of contemporaneity versus specificity and case law has not delineated a bright line rule on the matter, Commerce has the statutory discretion to give greater weight to one over the other, provided it offers a reasoned explanation when such a decision deviates from past practice.[10] Here, Commerce explained that the use of more contemporaneous data is "consistent with its duty to ensure antidumping duty rates . . . are as accurate as possible" (Def.'s Resp. at 29), given that "the Indian economy has been transforming quickly in the past few years, negating the relevancy of the nine year old data" (Def.'s Resp. at 27). This Court finds this explanation reasonable for both inquires.

Although this Court has upheld the favoring of specificity, it was not done so at the expense of contemporaneity. The court in *Yantai Oriental Juice Co. v. United States* considered that the generalized data was "dramatically more outdated" than the specific data. Slip Op. 02-

---

[10] The Court notes that Commerce has favored specificity where there was a five year span between the specific versus non-specific data. *See Heavy Forged Hand Tools from the People's Republic of China*, 62 Fed. Reg. 11,813, 11,816 (Dep't Commerce Mar. 13, 1997) (final results of antidumping duty admin. review) [hereinafter *1997 Hand Tools*] (in valuing labor costs, Commerce chose to use industry specific data from 1990 rather than less specific data from 1992 during the period of review for 1995-96); *Partial-Extension Steel Drawer Slides with Rollers from the People's Republic of China*, 60 Fed. Reg. 54,472, 54,474-76 (Dep't Commerce Oct. 24, 1995) (notice of final determination of sales at less than fair value) [hereinafter *Drawers*] (in valuing rivet inputs, Commerce chose to use industry specific data from 1994 rather than the less specific data from the period of investigation during 1995). Commerce defends its decision in the present matter, however, in that the "metals data are eight years older than the RBI [Bulletin] data, and are much further removed from the POR than the data available to [Commerce] in *1997 Hand Tools* and *Drawers*." *Decision Memo* at 21.

56, 2002 WL 1347018, at *11 (CIT June 18, 2002) (finding that Commerce's decision to value SG&A on the basis of outdated generalized rather than contemporaneous specific data was not supported by substantial evidence on the record); *see also CITIC*, 2003 WL 1587093, at *6 ("This court, however, has repeatedly recognized that Commerce's practice is to use surrogate prices from a period contemporaneous with the period of investigation."). This Court does not decide, however, whether contemporaneity should be valued over specificity without direct statutory instruction because a reviewing court is prohibited from substituting its judgment for that of the agency. *See Koyo Seiko*, 36 F.3d at 1570 ("[A] court must defer to an agency's reasonable interpretation of a statute even if the court might have preferred another.") (citation omitted).

Accordingly, this Court holds that Commerce's decision to use the more contemporaneous but general data is supported by substantial evidence on the record or otherwise in accordance with law.

### (4)    Request for revocation

This Court notes that this ninth review was determinative of a revocation. Pursuant to 19 C.F.R. § 351.222(b), Commerce denied revocation because it found Hangzhou sold subject merchandise at less than normal value in this review. Although the decision as it stands is supported by substantial evidence or otherwise in accordance with law, this Court finds that the issue of revocation may be affected by the voluntary remand. If upon review Commerce finds Hangzhou's dumping margin to be *de minimis*, then revocation may be warranted. This Court remands the issue of revocation along with the issue of subsidy suspicion policy, as these issues may affect each other.

## CONCLUSION

For the foregoing reasons, this Court affirms in part and remands in part Commerce's *Final Results*. This Court affirms Commerce's determinations on the issues of valuation of plating, and overhead, SG&A, and profit as being supported by substantial evidence on the record or otherwise in accordance with law. This Court grants Defendant's request for voluntary remand on the issue of subsidy suspicion policy regarding the valuation of steel wire rod. This Court also directs remand on the issue of revocation insofar as the voluntary remand review may affect the outcome of the revocation.

 /s/ Gregory W. Carman
Gregory W. Carman
Judge

Dated: July 6, 2005
New York, New York