# United States Court of Appeals for the Federal Circuit

2007-1556, -1557, -1558, 2008-1038

KOYO SEIKO CO., LTD. and KOYO CORPORATION OF U.S.A.,

Plaintiffs-Appellants,

and

NANKAI SEIKO CO., LTD.,

Plaintiff,

and

NIPPON PILLOW BLOCK COMPANY and FYH BEARING UNITS USA, INC.,
AMERICAN NTN BEARING MANUFACTURING CORPORATION,
NTN-BCA CORPORATION, NTN-DRIVESHAFT, INC.,
NTN BEARING CORPORATION OF AMERICA, and NTN CORPORATION,

Plaintiffs-Appellants,

and

NSK CORPORATION, NSK LTD., and NSK PRECISION AMERICA,

Plaintiffs-Appellants,

v.

UNITED STATES,

Defendant-Appellee,

and

TIMKEN US CORPORATION,

Defendant-Appellee.


Neil R. Ellis, Sidley Austin LLP, of Washington, DC, argued for plaintiffs-appellants Koyo Seiko Co., Ltd., et al. With him on the brief was Jill Caiazzo. Of counsel was Lawrence R. Walders.

Diane A. MacDonald, Baker & McKenzie LLP, of Chicago, Illinois, argued for plaintiffs-appellants Nippon Pillow Block Company, et al. With her on the brief for American NTN Bearing Manufacturing Corporation, et al., was Donald J. Unger. On the brief for Nippon Pillow Block Company, et al., were Kevin J. Sullivan and Kevin M. O'Brien, of Washington, DC. Of counsel was Thomas Peele, of Washington, DC.

Matthew P. Jaffe, Crowell & Moring LLP, of Washington, DC, argued for plaintiffs-appellants NSK Corporation, et al. With him on the brief were Robert A. Lipstein and Alexander H. Schaefer. Of counsel was Sobia Haque.

Claudia Burke, Senior Trial Counsel, Commercial Litigation Branch, Civil Division, United States Department of Justice, of Washington, DC, argued for defendant-appellee United States. With her on the brief were Gregory G. Katsas, Acting Assistant Attorney General, Jeanne E. Davidson, Director, and Patricia M. McCarthy, Assistant Director. Of counsel on the brief were David W. Richardson, Deborah R. King, and Sapna Sharma, Attorney-Advisors, Office of the Chief Counsel for Import Administration, United States Department of Commerce, of Washington, DC.

Geert M. De Prest, Stewart and Stewart, of Washington, DC, argued for defendant-appellee Timken US Corporation. With him on the brief were Terence P. Stewart, William A. Fennell, and Lane S. Hurewitz.

Appealed from: United States Court of International Trade

Judge Evan J. Wallach

# United States Court of Appeals for the Federal Circuit

2007-1556, -1557, -1558, 2008-1038

KOYO SEIKO CO., LTD. and KOYO CORPORATION OF U.S.A.,

Plaintiffs-Appellants,

and

NANKAI SEIKO CO., LTD.,

Plaintiff,

and

NIPPON PILLOW BLOCK COMPANY and FYH BEARING UNITS USA, INC.,
AMERICAN NTN BEARING MANUFACTURING CORPORATION,
NTN-BCA CORPORATION, NTN-DRIVESHAFT, INC.,
NTN BEARING CORPORATION OF AMERICA, and NTN CORPORATION,

Plaintiffs-Appellants,

and

NSK CORPORATION, NSK LTD., and NSK PRECISION AMERICA,

Plaintiffs-Appellants,

v.

UNITED STATES,

Defendant-Appellee,

and

TIMKEN US CORPORATION,

Defendant-Appellee.

Appeal from the United States Court of International Trade in consol. case no. 05-00560, Judge Evan J. Wallach.

_____

DECIDED:   December 16, 2008

_____

Before MICHEL, <u>Chief Judge</u>, FRIEDMAN, <u>Circuit Judge</u>, and Walker,[*] <u>Chief District Judge</u>.

FRIEDMAN, <u>Circuit Judge.</u>

Four Japanese ball bearing manufacturers and their United States affiliates (collectively, "the Manufacturers") challenge various aspects of the Department of Commerce ("Commerce")'s 15th review under Commerce's 1989 antidumping order covering certain ball bearings and parts thereof imported into the United States from six countries, including Japan.  <u>See</u> Antifriction Bearings (Other Than Tapered Roller Bearings) and Parts Thereof from the Federal Republic of Germany: Final Results of Antidumping Administrative Reviews, 56 Fed. Reg. 31,692 (Dep't of Commerce July 11, 1991) ("First Review").  The challenged review set antidumping duties for the Manufacturers on their imports during a 12-month period in 2003-2004.  <u>See</u> Ball Bearings and Parts Thereof from France, Germany, Italy, Japan, Singapore, and the United Kingdom:  Final Results of Antidumping Duty Administrative Reviews, 70 Fed. Reg. 54,711 (Dep't of Commerce Sept. 16, 2005) ("Final Results").

This court recently rejected two of the Manufacturers' principal contentions raised in another challenge to the 15th review by other ball bearing manufacturers.  <u>SKF USA, Inc. v. United States</u>, 537 F.3d 1373 (Fed. Cir. 2008).  That decision is dispositive of the two contentions here.  The Manufacturers' remaining contentions are unpersuasive.

_____

[*]       Honorable Vaughn R. Walker, Chief Judge, United States District Court for the Northern District of California, sitting by designation.

We therefore affirm the Court of International Trade's judgment upholding the Final Results (of the 15th review). See Koyo Seiko Co. v. United States, 516 F. Supp. 2d 1323 (Ct. Int'l Trade 2007).

I

In determining the existence and amount of dumping (i.e., selling at a price below fair value) in its annual review for a particular year under 19 U.S.C. § 1677b, Commerce compares the United States price of the "dumped" merchandise with the price of comparable merchandise in the exporter's or producer's home country, or a third-party country (the "comparison market"). Commerce first attempts to match sales of the "dumped" merchandise with sales of identical merchandise in the comparison market. 19 U.S.C. § 1677(16)(A) (2006). Where there is no identical merchandise, Commerce attempts to match a sale in the United States with a sale of "foreign like product" in the comparison market. Id. § 1677(16)(B)-(C). Under the statute, Commerce determines what merchandise is similar. Id. § 1677(C)(iii). If there are no foreign sales of similar merchandise, Commerce calculates a constructed value. Id. § 1677b(a)(4).

The process by which Commerce identifies "foreign like product" in determining dumping margins for ball bearings is called "model-matching."

In its First Review, Commerce adopted a "family" model-match methodology for determining comparable foreign products for ball bearings. Under that methodology, Commerce compared imported bearings to foreign-sold bearings based upon eight different physical criteria. Foreign bearings that matched the "dumped" bearings under those eight criteria were grouped into the same "family" of "foreign like product." Commerce then calculated the price of the "foreign like product" primarily by weight

averaging the prices of all matching foreign products sold. When the model-match process produced no matches, Commerce constructed a value for the foreign price.

After announcing in the 14th review that it intended to revise its model-match methodology, Commerce in its 15th review abandoned the "family" model-match methodology and adopted a two-step process under which it compared the "dumped" merchandise to a single matching foreign product.

In the first step, Commerce matched an import to products in the comparison market based upon four of the eight physical characteristics it previously had used. In the second step, Commerce selected from among the matches in the first step the single product that best matched the "dumped" product based on a comparison with the four other characteristics. As part of the second step, Commerce excluded foreign products that deviated from the "dumped" products by more than 40 percent in their physical measurements. The new process results in more individual matches than the old process, and thus Commerce did not have to use constructed prices as often as it did under the "family" approach.

In the 15th review Congress also continued to use the practice known as "zeroing," which deals with the situation where the United States price of the allegedly "dumped" merchandise is higher than the price charged in the comparison market. There the "antidumping" duty will be negative. Under zeroing, Commerce sets the antidumping margin at zero. The effect is that the negative margins do not offset positive margins. See NSK Ltd. v. United States, 510 F.3d 1375, 1379 (Fed. Cir. 2007).

In January 2007, more than a year after Commerce decided the 15th review, the World Trade Organization Appellate Body and Dispute Settlement Body ("WTO") held

zeroing to be inconsistent with WTO antidumping agreements. Appellate Body Report, United States—Measures Relating to Zeroing and Sunset Reviews, WT/DS322/AB/R (Jan. 9, 2007). The United States announced its intention to implement the recommendations of the WTO by December 24, 2007. See WT/DS322/20 (May 8, 2007).

In a lengthy and detailed opinion, the Court of International Trade affirmed Commerce's Final Results. The court held that both Commerce's "New Model Match Methodology" and its "practice of 'zeroing' negative dumping margins" were supported by substantial evidence and in accordance with law. Koyo-Seiko, 516 F. Supp. 2d at 1332, 1343-44. The court also rejected the Manufacturers' other challenges to Commerce's Final Results, which we discuss in Part III below.

"We review the Court of International Trade's decisions regarding Commerce's antidumping determinations de novo, applying the same standard of review to Commerce's antidumping determinations as did that court." SKF, 537 F.3d at 1377 (citing Carpenter Tech. Corp. v. United States, 510 F.3d 1370, 1372 (Fed. Cir. 2007) (citations omitted)). Thus, we must sustain Commerce's determinations unless they are "unsupported by substantial evidence on the record, or otherwise not in accordance with law." Id. (quoting 19 U.S.C. § 1516a(b)(1)(B)(i)).

II

A. In SKF, another group of foreign ball bearing manufacturers challenged the Final Results that are here under review. In its opinion there, issued ten days before we heard oral argument in this case, this court sustained both Commerce's new matching methodology and its use of zeroing in determining dumping margins in the 15th review.

The court ruled that Commerce's "new model-match methodology not only reflects a reasonable interpretation of the statute but also comports with our precedent." SKF, 537 F.3d at 1379. It stated: "In this case, Commerce provided adequate explanation of the reasonable 'compelling reasons' motivating its determination." Id. at 1380. The court rejected the manufacturers' contention that Commerce had erred in applying "the modified model-match methodology retroactively." Id. at 1380. It quoted with apparent approval the Court of International Trade's statement in Koyo Seiko, 516 F. Supp. 2d at 1334, that "[c]hanges in methodology, like all other antidumping review determinations, permissibly involve retroactive effect." Id. at 1381.

The court rejected as "unpersuasive" the manufacturers' challenges to Commerce's "zeroing" practice because they "fail[ed] to raise any argument not fully resolved by our established precedent." Id. at 1382. It quoted statements from several of this court's opinions upholding the practice, and concluded that "we need not revisit this issue today." Id.

This court's decision in SKF is controlling on the substance of those two issues and requires us to affirm Commerce's new model-match methodology and its use of "zeroing" here.

B. The Manufacturers urge us to remand this case to Commerce to reconsider its Final Results in the 15th review in light of the WTO ruling on "zeroing" and the United States' announced intention to comply therewith. We decline to do so.

It is doubtful that in SKF this court rejected such a remand. In their briefs there, the appellants, although challenging Commerce's use of "zeroing," did not ask for a remand. The SKF opinion does not discuss the point. In concluding that the appellants

there had not raised "any argument not fully resolved by our established precedent," 537 F.3d at 1382, it quoted the following statement from Corus Staal BV v. Department of Commerce, 395 F.3d 1343, 1349 (Fed. Cir. 2005): "We will not attempt to perform duties that fall within the exclusive province of the political branches, and we therefore refuse to overturn Commerce's zeroing practice based on any ruling by the WTO or other international body unless and until such ruling has been adopted pursuant to the specified statutory scheme." This statement is too slim a reed upon which to conclude that SKF definitively rejected such a remand. Thus, SKF is not controlling precedent on this issue.

Our recent decision in NSK Ltd. v. United States, 510 F.3d 1375 (Fed. Cir. 2007), however, calls for denial of remand here. In that case, three of the Manufacturers in their attack on the 14th administrative review had challenged the practice of zeroing. There, too, the WTO had issued its decision, and the United Sates had stated its intention to comply with its WTO obligations. Id. at 1379-80. The three Manufacturers sought remand in light of the WTO developments, but Commerce did not so request. There, just as here:

> [D]espite Commerce's public statement that it intended to comply with its WTO obligations, the WTO decision rejecting zeroing has not yet been implemented by Commerce. Moreover, the manner in which the WTO decision will be implemented by Commerce is far from clear, as illustrated by the parties' disagreement over whether Commerce will (or should) apply the WTO decision to administrative reviews such as this one. Situations such as this are just one example of the reasons this court refrains from commenting on international body decisions unless and until they have been adopted pursuant to the specified statutory scheme. Unless and until that happens, this court has nothing to review.

Id. at 1380. This reasoning is equally applicable here.

The determination whether, when, and how to comply with the WTO's decision on "zeroing," involves delicate and subtle political judgments that are within the authority of the Executive and not the Judicial Branch. Neither Commerce nor the Department of Justice has requested, or even suggested, such a remand. It would be most inappropriate for this court on its own to direct Commerce to reopen the Final Results of the 15th review to consider the impact on its decision of the subsequent WTO ruling, and we decline to do so.

III

The Manufacturers' remaining contentions relate to various details of Commerce's calculations in the 15th review. The Court of International Trade rejected these challenges because Commerce's actions were within its discretion and supported by substantial evidence. We agree.

A. In its model-matching determinations, Commerce used five different types of ball bearings in comparing foreign and domestic product prices. The Manufacturers American NTN Bearing Manufacturing Corporation, NTN-BCA Corporation, NTN-Driveshaft, Inc., NTN Bearing Corporation of America, and NTN Corporation (collectively, "NTN"), proposed that Commerce use a much larger number of bearing types, based on their own internal classifications of bearings. Commerce added two categories of bearings NTN proposed, but declined to use NTN's numerous other categories because NTN had "submitted over 80 pages of unusable bearing drawings, pictures and charts," and Commerce was not satisfied that each of NTN's design types was substantially distinct from the others or necessary for purposes of the administrative review.

NTN here challenges Commerce's refusal to accept its numerous bearing types primarily on two grounds. First, Commerce had accepted NTN's proposed design types in past reviews, and NTN had relied on such acceptance. Second, NTN gave Commerce evidence that NTN's design types were significantly different from each other.

But even if Commerce had accepted NTN's proposals in the past, it was not required to do so in future reviews. Moreover, NTN has not demonstrated that Commerce's choice of design types, including its adjustments, was unreasonable. NTN's claim that its design types are superior does not show that Commerce's use of its own types was unreasonable.

B. In determining antidumping duties, Commerce makes adjustments to constructed export prices. Commerce deducts costs "incurred by or for the account of the producer or exporter, or the affiliated seller in the United States, in selling the subject merchandise"–i.e., selling expenses, 19 U.S.C. § 1677a(d). Because dumping margins are calculated by subtracting the constructed export price from the normal value, any deductions made in calculating the constructed export price will produce greater dumping margins and thus higher antidumping duties. Importers thus benefit whenever expenses are not deducted.

The governing regulations that authorize Commerce to make adjustments to export or constructed export prices also provide that "[t]he interested party that is in possession of the relevant information has the burden of establishing to the satisfaction of the Secretary the amount and nature of a particular adjustment." 19 C.F.R. § 351.401(b)(1) (2006). Any party seeking a partial allocation of cost "must

2007-1556, -1557, -1558, 2008-1038        9

demonstrate to the Secretary's satisfaction that the allocation is calculated on as specific a basis as is feasible, and must explain why the allocation methodology used does not cause inaccuracies or distortions." Id. § 351.401(g)(2).

Commerce asked NTN to specify and explain its expenses, including calculations of indirect selling expenses. NTN reported its expense of warehousing certain merchandise, but asked Commerce to exclude from warehousing expenses amounts attributable to warehousing non-dumped merchandise. NTN reasoned that warehousing costs for the latter should not be treated as selling expenses for calculating constructed export prices. Cf. SKF USA Inc. v. INA Walzlager Schaeffler KG, 180 F.3d 1370, 1376 (Fed. Cir. 1999). After NTN did not respond to Commerce's request that it explain how it made that determination, Commerce refused to exclude that amount from indirect selling expenses.

In upholding Commerce's refusal to accept NTN's proposed treatment of its warehousing expenses, the Court of International Trade ruled that "NTN did not provide an explanation or even answer the specific inquiries made by Commerce into the reasoning behind its calculations." Koyo Seiko, 516 F. Supp. 2d at 1340-41. As noted, the governing regulations require that a party seeking a particular expense adjustment or allocation must demonstrate its correctness to the Secretary of Commerce's "satisfaction." Under this standard, the decision whether to accept a proposed allocation lies primarily within Commerce's discretion. In view of a lack of an adequate explanation by NTN for its proposed treatment of its warehouse expenses, Commerce acted within its discretion in rejecting NTN's allocation.

The grounds upon which NTN seeks to avoid that ruling–that it could not provide the reasoning behind its calculations because the amount in question "was not derived by a calculation" but was instead "recorded in a separate line item" and was "completely removed from the expenses related to" dumped merchandise – do not answer NTN's failure to point to any documentation it submitted proving that the amount involved covered non-dumped merchandise.

C.  Another disputed item of indirect selling expenses was "director's fees" NTN had paid.  The fees at issue involved directors who worked for two NTN entities, only one of which imported the dumped merchandise.  NTN proposed to allocate half of the fees to each of the companies.

Commerce rejected NTN's proposed allocation because it was not satisfied that it was "calculated on as specific a basis as is feasible" or that it "does not cause inaccuracies or distortions."  19 C.F.R. § 351.401(g)(2).  Instead, Commerce allocated the director's fees between the two companies based on the companies' respective sales.  NTN's complaint that Commerce's method "results in a ridiculously low amount that is clearly distortive" ignores the fact that NTN had the burden to justify its proposed allocation to Commerce's satisfaction and that Commerce concluded it had not done so. We agree with the Court of International Trade that Commerce acted within its discretion when it rejected NTN's proposed 50/50 allocation.

D.    The appellants NSK Corporation, NSK Ltd., and NSK Precision America (collectively "NSK") employed Japanese nationals in the United States.  In addition to paying them a salary, it provided them with benefits it was required to give them as Japanese nationals.  NSK agreed that the salaries it paid to its nationals were expenses

to be deducted from constructed export price. It contended, however, that the costs of the additional benefits were not deductible expenses because they were attributable not to the sales of the dumped merchandise in the United States but to the employees' status as Japanese nationals. Commerce determined that both the salaries and benefits paid to these employees were expenses associated with United States sales, and deducted both from the constructed export price for NSK's sales.

The additional benefits NSK paid were expenses incurred for employees whose work related to United States sales. NSK chose to use Japanese-national employees in the United States in connection with its sales there. Those benefits were part of the employees' compensation that NSK paid. The Court of International Trade properly concluded that "there is no difference between these additional benefits and the base salary that NSK has admitted Commerce properly deducted from the [constructed export price]." Koyo Seiko, 516 F. Supp. 2d at 1342.

## CONCLUSION

The judgment of the Court of International Trade affirming Commerce's Final Results of the 15th review is

## AFFIRMED.